IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES, | ) | Cr. No. 06-00323 ACK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES T. LOW, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL

On June 20, 2006, a jury trial against James T. Low

("Defendant") commenced, in which Defendant represented himself

pro se, with the assistance of stand-by counsel.[1]  On June 28,

---

[1] The indictment charged Defendant with the following three
counts:
        (1) Beginning at a date unknown and continuing up to
and including June 8, 2005, Defendant, along with Michael Silva,
who is not named as a defendant in the indictment, did knowingly
and intentionally combine, conspire, confederate and agree
together, with each other, and with others known and unknown, to
distribute with each other, and with others known and unknown, 50
grams or more of methamphetamine, a Schedule II controlled
substance, in violation of 21 U.S.C. §§ 846, 841(a)(1) and
(b)(1)(A);
        (2) On or about June 8, 2005, Defendant did knowingly
and intentionally possess, with intent to distribute, 50 grams or
more of methamphetamine, a Schedule II controlled substance, in
violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A);
        (3) On or about June 8, 2005, having been convicted of
a crime punishable by imprisonment for a term exceeding one year,
Defendant did knowingly possess, in and affecting commerce,
firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1)
and 924 (a)(2).

2006, a jury returned guilty verdicts against Defendant for (1) conspiracy to distribute methamphetamine and (2) possession with intent to distribute methamphetamine.[2/]  The jury returned a not guilty verdict on the count of firearm possession.

Defendant filed a motion for new trial on July 5, 2006. See Defendant's Motion for New Trial and for Extension of Time To File Other Motions for New Trial (July 5, 2006) ("Motion for New Trial").[3/]  With the Court's permission, Defendant filed a Supplemental Memorandum in Support of Motion for New Trial ("Defendant's Supp. Memo") on August 4, 2006.  The Government filed a Memorandum in Opposition to Defendant's Motion for New Trial ("Opposition") on September 1, 2006.  Defendant filed a reply memorandum on September 22, 2006 and an Amended Reply Memorandum ("Reply") on September 27, 2006.  The Court held an evidentiary hearing on November 27 and 29, and December 1 and 4, 2006.  Defendant filed a Second Supplemental Memorandum in Support of Motion for New Trial ("Second Reply Brief") on December 12, 2006.

---

[2/]The jury returned guilty verdicts as to Counts 1 and 2, finding in each count that Defendant was responsible for 50 grams or more of methamphetamine, its salts, isomers and salts of its isomers.

[3/]The motion and all related papers were prepared by Defendant's stand-by counsel.

2

## STANDARD

Federal Rule of Criminal Procedure 33(a) provides, in relevant part, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Proc. 33(a).[4/]

In evaluating a motion for new trial under this rule, the district court "is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000). If the court concludes that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the court may grant the motion for a new trial. Id. (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).

"The decision whether to hold an evidentiary hearing on a motion for new trial is within the sound discretion of the trial judge." United States v. Scott, 521 F.2d 1188, 1195 (9th

_____

[4/]When a motion for new trial under Rule 33 is "grounded on newly discovered evidence," it must be filed within 3 years after the verdict or finding of guilty; however, if an appeal is pending, the court may not grant the motion for new trial until the appellate court remands the case. See Fed. R. Crim. Proc. 33(b)(1). When a motion for new trial under Rule 33 is "grounded on any reason other than newly discovered evidence," it "must be filed within 7 days after the verdict or finding of guilty." See Fed. R. Crim. Proc. 33(b)(2).

3

Cir. 1975); see also United States v. Colacurcio, 499 F.2d 1401,
1406 (9th Cir. 1974) (noting that motions for new trial are
ordinarily decided solely upon affidavits).  In this case, the
Court finds that the only issues warranting an evidentiary
hearing are Defendant's claims that his due process rights were
violated because the Government knowingly permitted false
testimony to be presented at trial and that the Government
intimidated and interfered with Defendant's witnesses.  The
remaining issues are suitable for disposition without a hearing
because those issues have been fully and adequately briefed by
the parties.  See L.R. 7.1(d).

## DISCUSSION

Defendant's Motion for New Trial is brought pursuant to
Federal Rule of Criminal Procedure 33(a) and (b)(2), on the basis
of four separate arguments: (1) Defendant's self-representation
constituted a violation of his rights to competent counsel and
due process of law; (2) Defendant's witnesses were intimidated by
the Government; (3) the Government knowingly permitted false
testimony at trial; and (4) the Court failed to give Defendant's
requested response to the jury's question during deliberations.
See Defendant's Supp. Memo at 2, 5, 13, 17.  In a Second Reply
Brief, Defendant adds a fifth argument: that pursuant to Federal
Rule of Criminal Procedure 33(b)(1), a new trial should be
granted because of newly discovered evidence.  See Second Reply

4

Brief at 1-3.  The Court finds no merit to any of Defendant's arguments.

## I.   Defendant's Self-Representation

Defendant's argument that his self-representation constituted a violation of his rights is based on two theories. First, that his waiver of counsel was constitutionally deficient under the Sixth Amendment.  <u>See</u> Defendant's Supp. Memo at 5. Second, that his self-representation was so ineffective that it violated his right to due process of law under the Fifth Amendment.  <u>See</u> <u>id.</u> at 8.

### A.   Waiver of Counsel

The Court finds that Defendant knowingly, voluntarily, and unequivocally waived his right to representation by counsel. <u>See</u> <u>Faretta v. California</u>, 422 U.S. 806 (1975); <u>United States v. Farhad</u>, 190 F3d 1097, 1099-1100 (9th Cir. 1999); <u>see also</u> <u>United States v. Hayes</u>, 231 F.3d 1132 (9th Cir. 2000).  This case presents unusual circumstances because the Court dismissed without prejudice the indictment against Defendant the day before trial was set to commence, for violation of the Speedy Trial Act (in Crim. No. 05-00260).  A new indictment, with identical facts and charges, was then issued under a new criminal docket number (Crim. No. 06-00323, the docket number under which the instant motion is brought).  Although the Court opened a new docket number for the second indictment, the Court linked the two

dockets, as discussed below.

### 1.   Factual History

Defendant fired at least four attorneys and repeatedly requested to represent himself.  On at least five separate occasions, three different judges discussed with Defendant the pitfalls of self representation.  As Defendant admits, he "proceeded pro se because he was disillusioned with his experiences with previous attorneys."  See Reply at 5.

On February 24, 2006 in Crim. No. 05-00260 (the first docket), Defendant appeared before Magistrate Judge Chang for a hearing on defense counsel's motion to withdraw as counsel and Defendant's request to waive counsel and proceed pro se. Defendant stated, "I have defended myself before.  I know what I'm doing.  I know what is involved."  Transcript of Proceedings Before the Hon. Kevin S.C. Chang at 19 (Feb. 24, 2006).  After a Faretta colloquy in which Judge Chang discussed with Defendant the nature of the charges, the possible penalties, the effect of any prior convictions, and the dangers and disadvantages of self-representation, Judge Chang determined that, at that time, the record did not establish a basis to allow Defendant to waive his right to counsel.  See id. at 20.  Judge Chang determined that, at that time, Defendant's apparent primary concern was to have an expeditious and speedy trial - a goal that could be accomplished with counsel.  Id. at 19.  Accordingly, Judge Chang denied

Defendant's request to waive right to counsel and to represent
himself at that time.  <u>Id.</u>

One week later at a hearing before Magistrate Judge
Kurren, Defendant made a second request to represent himself pro
se.  Defendant argued that "I feel I would be able to fight for
my life better than anybody else" and maintained that "I feel as
though I need to defend myself in court."  <u>See</u> Transcript of
Further Hearing on Motion To Withdraw as Counsel Before the Hon.
Barry M. Kurren at 5, 12 (Mar. 3, 2006).  Judge Kurren urged
Defendant to accept representation by counsel, stating: "I want
to be absolutely clear to you that . . the hazards that are
presented [by proceeding without counsel] . . . are darn near
almost insurmountable in representing yourself."  <u>Id.</u> at 5.
Judge Kurren continued the hearing to give Defendant additional
time to consult with counsel and reevaluate his request to
proceed pro se.  <u>Id.</u> at 11-14.

On March 10, 2006, Defendant appeared before Judge
Kurren, again requesting to waive his right to counsel and
proceed to trial pro se (although indicating that he would accept
stand-by counsel).  <u>See</u> Transcript of Proceedings Before the Hon.
Barry M. Kurren at 2 (Mar. 10, 2006).  Judge Kurren conducted a
lengthy <u>Faretta</u> colloquy, in which Judge Kurren discussed with
Defendant the nature of the charges against Defendant, the
possible penalties, the effect of prior convictions, and the

dangers and disadvantages of self-representation.  Id. at 4-11.

In response to Judge Kurren's repeated and strong urging that

Defendant accept counsel, Defendant maintained his request to

waive his right to counsel, indicating that he had previously

represented himself in a criminal case that resulted in a hung

jury, only to be convicted at the retrial when represented by

counsel.  Id. at 9-11.  Judge Kurren granted Defendant's request

to waive counsel, finding that Defendant knowingly and

voluntarily waived his right to counsel; Judge Kurren also

appointed stand-by counsel.  Id. at 12.[5/]

---

[5/]Defendant now asserts that "he was forced to represent
himself because he recalls that his prior attorneys withdrew when
he made it clear that he wished to continue to plead not guilty
and go to trial to fight his case."  See Defendant's Supp. Memo
at 9 n.3 (emphasis added).  The Court finds no merit to
Defendant's assertion that he was forced to represent himself.
At the March 3, 2006 hearing, Defendant requested to proceed pro
se, saying that it was not his attorneys' fault, but that he felt
as though he needed to defend himself in court.  See Transcript
of Further Hearing on Motion To Withdraw as Counsel Before the
Hon. Barry M. Kurren at 12 (Mar. 3, 2006).  At that time, Judge
Kurren denied Defendant's attorneys' motion to withdraw from the
case and continued the hearing of Defendant's request to proceed
pro se in order to give Defendant additional time to weigh his
options and consult with his attorneys.  Id. at 12-14.  One week
later, Defendant maintained his desire to proceed pro se.  See
Transcript of Proceedings Before the Hon. Barry M. Kurren at 2
(Mar. 10, 2006).  When Judge Kurren warned Defendant of the
perils of self-representation, Defendant responded that he had
previously represented himself in a criminal case that resulted
in a hung jury, only to be convicted at the retrial when
represented by counsel.  Id. at 9-11.  Judge Kurren agreed to
permit Defendant to proceed pro se only after a lengthy Faretta
colloquy in which Defendant explicitly stated that proceeding pro
se was a voluntary decision.  Id. at 10 ("THE COURT: Is this a
voluntary decision on your part? THE DEFENDANT: Yes, sir.").  In
(continued...)

The following month, Defendant appeared before Judge Seabright for arraignment on the Second Superseding Indictment in Crim. No. 05-00260.  Judge Seabright conducted a detailed <u>Faretta</u> colloquy, discussing with Defendant the nature of the charges against Defendant, the possible penalties, and the dangers and disadvantages of self-representation.  <u>See</u> Transcript of Proceedings Before the Hon. J. Michael Seabright at 13-22 (Apr. 13, 2006).  Judge Seabright warned Defendant that "In my opinion, in the final analysis, self-representation is almost always unwise.  From the standpoint of professional skill, training, education, experience and ability, it will not be a fair fight." <u>Id.</u> at 22.  Defendant indicated that he understood, but that he wanted to continue to represent himself.  <u>Id.</u>

On the day before trial was scheduled to commence in Crim. No. 05-00260, this Court informed the parties that it was inclined to find that a Speedy Trial Act violation had occurred and that the indictment should be dismissed without prejudice. <u>See</u> Transcript of Proceedings Before the Hon. Alan C. Kay at 8 (June 5, 2006).  The Court informed the parties that, should it decide to dismiss the indictment without prejudice, a new complaint could be immediately filed by the Government (which

---

[5]/(...continued)
fact, no number of <u>Faretta</u> colloquies would have changed Defendant's desire to proceed pro se because, as Defendant admits, "he was disillusioned with his experiences with his previous attorneys."  <u>See</u> Reply at 5.

would presumably result in a new indictment) and if Defendant agreed, Defendant could proceed to trial with only a two week delay from the scheduled trial date of June 6, 2006 in Crim. 05-00260.  Id.  Defendant indicated that he did not want any delay and objected to any continuance of his trial date. Id. at 11-12.

On June 8, 2006, the Court dismissed the indictment in Crim. No. 05-00260 without prejudice for violation of the Speedy Trial Act, as the Court had indicated it was inclined to do. That same day, Defendant made an appearance before Magistrate Judge Kurren on the new complaint filed by the Government in Crim. No. 06-00323, which was based on identical facts and charges as the prior indictment.  Defendant informed the Court that he would "like to proceed pro se completely." See Transcript of Initial Appearance Before the Hon. Barry. M. Kurren at 2 (June 8, 2006).  Judge Kurren adopted the Defendant's prior colloquy and the Court's previous findings made in response to that colloquy.  Id. at 3.  Judge Kurren found that there was no need to conduct a new Faretta colloquy since the Court and Defendant had already conducted the colloquy (on these same charges, stemming from the same facts, under the old, related docket number).  Id.  Judge Kurren reiterated his warning to Defendant about the dangers and disadvantages of self-representation, and recommended that Defendant accept counsel. Defendant reiterated that he "would like to proceed without

10

counsel." Id. See also Order Granting Government's Motion To
Detain Defendant Without Bail at 2 (June 13, 2006) (noting that
the Court granted Defendant's request to proceed pro se based on
findings the Court has previously made in Crim. No. 05-00260).
Based on the adopted colloquy and findings, Judge Kurren
permitted Defendant to proceed pro se.[6]

On June 14, 2006, a grand jury returned an indictment
against Defendant in the new docket, Crim. No. 06-00323. The
indictment is materially identical to the indictment that was
dismissed in the prior docket. Compare Indictment, Crim. No. 06-
00323 (June 14, 2006), with Second Superseding Indictment, Crim.
No. 05-00260 (Apr. 12, 2006).

On June 15, 2006, at a status conference in Crim. No.
06-00323, Defendant reiterated his desire to proceed pro se. See
Transcript of Proceedings Before the Hon. Alan C. Kay at 8 (June
15, 2006).[7] The Court adopted its prior rulings made in Crim.

---

[6]Defendant acknowledges that Judge Kurren permitted
Defendant to proceed pro se based on the Court's prior findings.
See Defendant's Supp. Memo at 6 ("Defendant appeared on June 8,
2006, before the Magistrate Judge and his request to proceed as a
pro se defendant was granted based on the court's previous
findings in Cr. No. 05-00260 ACK. The Court ruled that the
defendant could proceed as a pro se defendant in the pending case
. . . based on the Court's findings in the previous case . . .
.").

[7]Defendant reiterated his desire to proceed pro se and
without stand-by counsel:
          THE DEFENDANT: . . . I have already stated that I -- I
          do not trust -- even if I do -- I had stated that I
                                        (continued...)

11

No. 05-00260.  See id. at 2 ("THE COURT: Now, there are a number
of things that we should do to, in effect, readopt and refile
those matters that we previously considered and ruled on."); see
also id. at 13.  The Court also reiterated Defendant's
constitutional right to proceed pro se and discussed trial
procedures with him (such as opening statements, questioning of
witnesses, and closing arguments).  Id. at 22-23.[8]  Trial

---

[7]/(...continued)
would -- I do not need Mr. Kawana's assistance; and you
have forced him to stay on.  That, I -- I can go with
because you're paying him, not me.
THE COURT: Yeah, my instructions to you have been that
you may use him as you wish or not use him as you wish.
THE DEFENDANT: Yes, I understand that.  Now -- and I
have stated that I do not wish to use him because I
cannot -- I do not know whether to accept his answer as
true or false; but if you want him to be here, I can --
I'll accept that.  I have no problems with that.
THE COURT: Well, I think you found that at the last
hearing on the Speedy Trial Act that he helped you a
lot.
THE DEFENDANT: I don't believe he helped me at all.
THE COURT: Well, he did.  So, that's something that you
should realize.
THE DEFENDANT: I believe –
THE COURT: He knows a lot more about the law than you
do.
Transcript of Proceedings Before the Hon. Alan C. Kay at 8 (June
15, 2006).

[8]/For example, the following exchange occurred:
THE COURT: And, again, you're -- you're proceeding pro
se.  You have that constitutional right.  You also have
a constitutional right to an attorney.  We've appointed
Mr. Kawana as your stand-by counsel, and you may use
him as you wish or not use him.  But I just want to
reiterate again, Tuesday at the start of trial we'll be
selecting a jury; and then after the jury selection
you'll -- the defense will be making -- or you can
(continued...)

commenced five days later.

At the trial, Defendant gave opening and closing statements and examined the witnesses.  Stand-by counsel, however, was involved extensively in the trial, including meeting with and advising Defendant outside of trial, consistently consulting with Defendant during witness examinations, frequently making objections during the course of trial, making motions, and preparing memoranda.  Indeed, the stand-by counsel in this case did an excellent job and was much more involved than a typical stand-by counsel.  The Court notes that it bent over backwards to accommodate Defendant's requested pro se status, including making special arrangements with the Federal Detention Center and U.S. Marshal's Office to permit Defendant unique access to interview witnesses and to allow Defendant to meet with his mother (who was

_____

[8]/(...continued)
        waive an opening statement if you don't want to make it
        at that time.  But that's something you'll have to be
        prepared to make unless you want Mr. Kawana to do it
        for you.
        THE DEFENDANT: I'll be ready.
        THE COURT: Pardon me?
        THE DEFENDANT: I'm ready.
        THE COURT: Okay.  And then you will be questioning
        witnesses, making objections if you feel the
        government's asking improper questions that aren't
        permitted by the rules.  You understand that?
        THE DEFENDANT: I understand.
        THE COURT: No leading questions.  And then you'll have
        to be prepared for final argument at the end of the
        case, too, as well as preparing questions for your own
        witnesses when you call them.
Transcript of Proceedings Before the Hon. Alan C. Kay at 22-23
(June 15, 2006).

given special status akin to a paralegal), in addition to stand-
by counsel, to organize his case.  Defendant's mother was also
permitted, over the objection of the Government, to sit at the
defense counsel table (with stand-by counsel and Defendant)
during the course of trial, to assist Defendant in whatever way
he deemed necessary.

After the trial (and to this day), Defendant has
repeated his desire to proceed pro se.  For example, in a recent
declaration, Defendant reiterated his desire to interview his
witnesses personally before the evidentiary hearing, so that he
could adequately prepare to represent himself, pro se, at that
hearing.  See Declaration of James T. Low at 1-2 (Nov. 22, 2006)
(attached to Defendant Low's Motion To Continue Evidentiary
Hearing).  At the evidentiary hearing itself, despite permitting
stand-by counsel to conduct the majority of the examinations,
Defendant proceeded to examine one witness himself - further
confirming Defendant's continued desire to represent himself pro
se.  See Transcript of Proceedings at 36 (Nov. 29, 2006).[9/]  Even

---

[9/]Prior to the evidentiary hearing, Defendant requested
special accommodations at the Federal Detention Center and at the
U.S. Courthouse to interview his witnesses personally, so that he
could adequately represent himself pro se at the evidentiary
hearing.  See Defendant Low's Motion To Continue Evidentiary
Hearing and attached declaration (Nov. 22, 2006).  The Court
arranged these special accommodations for Defendant prior to the
hearing (but denied Defendant's request to continue the hearing).
See Transcript of Proceedings at 3-8 (Nov. 27, 2006).  The
defense opted to have stand-by counsel examine the first witness
(continued...)

14

one of Defendant's recent requests for transcripts of the evidentiary hearing emphasize his continued desire to proceed pro se.  See CJA 24 Authorization and Voucher for Payment of Transcript (Nov. 27, 2006) (transcripts requested because "pro se defendant requires all assistance possible in representing himself during hearing on the motion for new trial and for probable appeal thereafter").

### 2.   Analysis

The Court finds that it was appropriate for Judge Kurren, in the new docket number, to adopt the existing Faretta colloquy and the Court's related findings.  Likewise, it was appropriate for this Court to adopt all of its previous findings and rulings.  The Court had already conducted numerous Faretta colloquies with Defendant and it was abundantly clear that

---

[9]/(...continued)
(Bibian Nguyen) on direct examination; presumably because, while stand-by counsel had interviewed the witness, Defendant had not recently interviewed the witness and Defendant asserted that he was not prepared to examine her.  After the Government cross examined Nguyen, Defendant requested a short continuance so that he could interview the witness himself before personally asking her questions on redirect.  The Court granted Defendant the short continuance.  Upon resuming the hearing, Defendant himself proceeded to question Nguyen on redirect.  After some questioning of the witness, Defendant determined that he was "not ready" to question the witness.  The Court granted Defendant another short continuance (over the lunch break) so that Defendant could prepare.  When the hearing resumed, Defendant indicated that he would have his stand-by counsel ask the remaining questions because, Defendant stated, standby counsel could relay the questions more clearly.  See Transcript of Proceedings at 33-43 (Nov. 29, 2006).

Defendant wished to proceed pro se and had made a knowing,
voluntary, and unequivocal waiver of his right to counsel.
Conducting yet another detailed <u>Faretta</u> colloquy could have been
construed as badgering Defendant and infringing on his
constitutional right to self-representation.

   The Court emphasizes that the two dockets at issue here
are inextricably linked.  The new indictment, which is materially
identical to the indictment that was dismissed, was filed as a
result of the Court's ruling that Defendant's Speedy Trial Act
rights were violated.  Before that ruling, the Court specifically
directed the Government to prepare a new complaint and be
prepared to file it upon the dismissal of the indictment in the
first case.  <u>See</u> Transcript of Proceedings Before the Hon. Alan
C. Kay at 8 (June 5, 2006).  In fact, the Court delayed the hour
at which its ruling of dismissal would take effect so that the
Government could file the new criminal complaint before the first
case was dismissed.  <u>See</u> Transcript of Proceedings Before the
Hon. Alan C. Kay at 17 (June 8, 2006).  In the Order Dismissing
Indictment Without Prejudice for Violation of the Speedy Trial
Act, the Court specifically referred to the new complaint that
would be filed against Defendant and referenced the date that the
grand jury would hear the new petition for indictment.  <u>See</u> Order
Dismissing Indictment Without Prejudice for Violation of the
Speedy Trial Act at 27, n.17 (June 14, 2006).  Before dismissing

16

the prior indictment, the Court confirmed with Defendant that he wished to proceed to trial under the new indictment forthwith, and even went so far as to schedule a trial date for the new docket number at the hearing on the Speedy Trial Act (before the new indictment was filed).  See Transcript of Proceedings Before the Hon. Alan C. Kay at 8-9, 11-12 (June 5, 2006).  Moreover, after the Government filed the new complaint, the Court adopted the Faretta colloquy and the Court's related findings that were made on the record in the first case.  See Transcript of Initial Appearance Before the Hon. Barry M. Kurren at 2-3 (June 8, 2006); see also Defendant's Supp. Memo at 6.  Similarly, the Court incorporated the previous motions and other pretrial matters from the first case, and adopted and incorporated all of the Court's findings and rulings from the first case.  See Transcript of Proceedings Before the Hon. Alan C. Kay at 13 (June 15, 2006).

    In summary, the Court repeatedly discussed with Defendant the nature of the charges against Defendant, the possible penalties, and the dangers and disadvantages of self-representation.  Defendant repeatedly informed the Court of his deep distrust of attorneys and his desire to represent himself pro se.  See, e.g., Defendant's Supplemental Memorandum in Support of Motion To Dismiss Indictment for Violation of Right to Speedy Trial at 4 (June 7, 2006); Transcript of Further Hearing on Motion To Withdraw as Counsel Before the Hon. Barry M. Kurren

at 3-4 (Mar. 3, 2006); <u>see also</u> Reply at 5 ("Defendant proceeded pro se because he was disillusioned with his experiences with his previous attorneys").  Perhaps most telling of all, to this day Defendant continues to express the desire to represent himself pro se - Defendant made this desire clear leading up to and at the evidentiary hearing, requesting special accommodations (which were granted by the Court) so that he could interview his witnesses personally prior to the evidentiary hearing.  <u>See, e.g.,</u> Defendant Low's Motion To Continue Evidentiary Hearing and attached declaration (Nov. 22, 2006).  At the evidentiary hearing itself, Defendant conducted an examination of one witness himself (although the Defendant ultimately decided to cut that questioning short).  <u>See</u> discussion <u>supra</u> note 9.

It is clearly evident to this Court that: Defendant strongly desired to proceed pro se; the Court informed Defendant of the nature of the charges against him on which he was tried, the possible penalties, the effect of prior convictions, and the dangers and disadvantages of self-representation; Defendant knowingly, voluntarily, and unequivocally waived his right to counsel and elected to proceed pro se (with the assistance of stand-by counsel); and Defendant has continued to indicate his desire to proceed pro se.  Any other conclusion would represent a serious miscarriage of justice.

**B.    Alleged Ineffective Representation**

Defendant argues that he represented himself in such a deficient and ineffective manner that his self-representation violated his own rights to due process of law under the Fifth Amendment.  <u>See</u> Defendant's Supp. Memo at 8, 11.  Specifically, Defendant argues that his inadequate self-representation resulted in an unfair trial.  <u>Id.</u> at 13.

The U.S. Supreme Court has made it abundantly clear that once a defendant knowingly and voluntarily waives his right to representation, he cannot later complain that his own self representation was deficient: "Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"  <u>Faretta</u>, 422 U.S. at 834.  Defendant's argument fails on this basis alone.

Even if Defendant could be heard to argue that his self-representation was deficient,[10] Defendant's argument would fail because his self-representation was not so ineffective as to constitute an unfair trial.  First, Defendant consulted with stand-by counsel constantly throughout the course of the trial,

---

[10]<u>See</u> <u>Farhad</u>, 190 F.3d at 1106-08 (J. Reinhardt concurring specially) (discussing the tension between a defendant's right to waive representation by counsel and a defendant's right to a fair trial).

and stand-by counsel was very active, making objections and
motions during the course of trial (as well as filing pre and
post trial memoranda).

Second, Defendant was able to elicit favorable
testimony from the Government's key witness (the alleged co-
conspirator), Michael Silva, on cross-examination.  Defendant
elicited testimony from Silva that Silva lied to the Defendant
after they had been arrested (and, implicitly, that Silva thought
it was okay to lie).  See Transcript of Proceedings at 125 (June
21, 2006).  Defendant also elicited testimony from Silva that (1)
Silva hoped to receive a reduction to his sentence in exchange
for his testimony against Defendant and (2) the Government
dropped the possession charge against Silva in exchange for his
cooperation and plea of guilty to the conspiracy charge.  Id. at
122; Transcript of Proceedings at 63 (June 23, 2006).  Such
testimony by Silva on cross examination could have been viewed by
a factfinder as undermining the credibility of Silva's testimony
implicating Defendant in the conspiracy, since Silva could be
viewed as benefitting from a conviction against Defendant.

Third, Defendant was able to elicit favorable testimony
on cross examination of other Government witnesses as well.  For
example, Defendant elicited testimony from James Low, Sr., that
the expensive television that Defendant had put in his parents'
house belonged to a friend of Defendant.  See Transcript of

20

Proceedings at 100 (June 22, 2006).  Such testimony could have
been viewed by a factfinder as undermining the Government's
position that Defendant purchased expensive items with the
profits from illegal drug distribution.  Defendant also elicited
testimony from Special Agent Charles Pang that law enforcement
did not run a fingerprint analysis on the firearms recovered from
the storage locker.  See Transcript of Proceedings at 109 (June
22, 2006).  Such testimony could have been viewed by a factfinder
as supporting Defendant's theory that the firearms belonged to
Silva and that, had a fingerprint analysis been run, Silva's
prints would have been found on the firearms.  Additionally,
Defendant was able to convey to the jury during the cross-
examination of Special Agent Gerald Lawson that Defendant was
facing a punishment of a life sentence or 30 years to life - a
fact that the jury should not consider in determining guilt or
innocence, and which could cause jurors to feel sympathetic
toward Defendant.  See Transcript of Proceedings at 44-45 (June
21, 2006).

        Fourth, Defendant elicited favorable testimony when
presenting his case.  Defendant elicited testimony from Denise
Keliinoi that the Algaroba Street apartment and the firearms in
the storage locker all belonged to Silva.  See Transcript of
Proceedings at 42-44 (June 23, 2006).  This testimony directly
contradicted the Government's theory that the Algaroba Street

apartment (including the drugs and drug paraphernalia in that apartment) and the storage locker (including the firearms in that storage locker) were used by Defendant.

Fifth, Defendant gave a competent and effective closing argument, pointing out the stringent burden of proof and what he viewed as the evidentiary flaws in the Government's case.  <u>See</u> Transcript of Proceedings at 52-60 (June 27, 2006).

Sixth, Defendant's effectiveness at self-representation is most clearly demonstrated by the fact that he obtained a not guilty verdict on the firearm count - one of the three counts against him.  The Government presented evidence in support of each element of that crime, including that the firearms belonged to Defendant.  Had Defendant's self-representation been completely ineffective, he could not have obtained a not guilty verdict on that count.

Finally, the Court took pains to accommodate Defendant's pro se status and ensure that he had a fair trial. For example, the Court gave Defendant wide latitude in questioning the witnesses.  The Court also granted Defendant's request to recess at 2 p.m. on Friday, June 23, 2006, so that Defendant could have until Tuesday morning to determine whether he wanted to call any character witnesses, to reevaluate whether he wanted to testify, and to prepare his closing argument. <u>See</u>

Transcript of Proceedings at 105-110 (June 23, 2006).[11/]

In summary, the Court finds that Defendant did not receive an unfair trial based on his self-representation.[12/]

## II.   Alleged Witness Intimidation

"Unnecessarily strong admonitions against perjury aimed at discouraging defense witnesses from testifying have been held to deprive a criminal defendant of his Sixth Amendment right to compulsory process for obtaining witnesses in his favor." United States v. Vavages, 151 F.3d 1185, 1188 (9th Cir. 1998).   "The prosecution's conduct must amount to a substantial interference

---

[11/]As discussed supra, the Court also arranged special accommodations for Defendant at the Federal Detention Center and with the U.S. Marshal's Office so that Defendant could interview witnesses and meet with his mother and stand-by counsel.

[12/]Additionally, the Court notes that Defendant's decision not to testify was voluntary and did not result in an unfair trial.   The Court repeatedly reminded Defendant of his right to testify and cautioned him to consider the manner in which he would like to present his testimony, if he chose to testify. See, e.g., Transcript of Proceedings at 5 (June 1, 2006).   The Court specifically informed Defendant that, if he decided to testify, he could have stand-by counsel ask the questions or could ask the questions of himself.   Id.   Defendant indicated that he understood his constitutional right to testify or not testify and did not express any concern about his self-representation.   Id.   Additionally, the Court notes that any attorney would likely have advised Defendant not to testify.   Had Defendant elected to testify, the Government would have had the opportunity to introduce evidence of his three prior drug felony convictions, which the Court had previously ruled could be admitted for impeachment purposes if Defendant testified.   See Order Regarding Motions in Limine and Other Pre-Trial Orders at 14-16 (June 5, 2006).   The Government also argues that incriminating statements made by Defendant in his early efforts at cooperation could have been used against Defendant in cross-examination, if Defendant had testified.   See Opposition at 12.

with the defense witness's free and unhampered determination to testify before the conduct violates the defendant's right to due process." Williams v. Woodford, 384 F.3d 567, 602 (9th Cir. 2004).

Defendant alleges that the Government intimidated and interfered with three of his witnesses, which he claims resulted in those witnesses giving incomplete and/or incorrect testimony, in violation of Defendant's substantive right to due process of law as set forth in Vavages and Woodford. See Defendant's Supp. Memo at 16.[13]

A. Eric Marumoto

Defendant argues that Eric Marumoto "did not testify truthfully" at trial and directs the Court to Marumoto's post-trial declaration and his testimony at the evidentiary hearing, which set forth additional and different facts than those to which Marumoto testified at trial. See Defendant's Supp. Memo at 14; see generally Marumoto Decl. (Sept. 22, 2006).[14]   The Court

---

[13]These witnesses were called by the Government in the Government's case in chief; however, one witness (Bibian Nguyen) is Defendant's girlfriend and another (Eric Marumoto) was named on Defendant's witness list.  For purposes of Defendant's argument, the Court will assume without deciding that the witnesses can be considered "defense witnesses" for purposes of the Vavages/Woodford analysis.

[14]When Marumoto testified at trial, he spelled his last name "Morimoto."  See Transcript of Proceedings at 21 (June 23, 2006). However, in his post-trial declaration, he spelled it "Marumoto" and stated that "My name is commonly misspelled as Morimoto."
                                                    (continued...)

finds that the new and different facts contained in the declaration and outlined in Marumoto's testimony at the evidentiary hearing do not indicate that Marumoto was coerced or unlawfully intimidated.  Such discrepancies could have any number of explanations, including that Marumoto's recollection was rusty at trial or that he was generally anxious about testifying.  In fact, Marumoto explicitly stated at the evidentiary hearing that no one tried to coerce him to do or not do anything or to say anything in particular on the stand.  See Transcript of Proceedings at 25, 27 (Dec. 1, 2006); see also id. at 11.

Defense witness Denise Keliinoi stated in a post-trial declaration, and reiterated at the evidentiary hearing, that Marumoto appeared "frightened and nervous" prior to testifying, and that Marumoto said he could not speak to her because the "Feds" and "DEA" were watching him.  See Keliinoi Decl. at 1 (Sept. 22, 2006); see also Transcript of Proceedings at (Dec. 1, 2006).  However, Keliinoi's statements simply do not indicate that Marumoto was intimidated or coerced, especially given his statements to the contrary at the evidentiary hearing.

---

[14]/(...continued)
See Marumoto Decl. at 1, 3.  The Court will use the spelling contained in the declaration, which was confirmed by Marumoto when he took the stand at the evidentiary hearing.  For additional discussion of the differences between Marumoto's testimony at trial and at the post-trial evidentiary hearing, see infra Section III.B.

Also regarding the issue of whether Marumoto was intimidated by the Government, Keliinoi stated in her declaration that she observed DEA Task Force Officer Joyce Alapa "go into the witness room at least two times and saw her speaking to Mr. [Marumoto] who was the only one present in the room." See Keliinoi Decl. at 1; see also Transcript of Proceedings at 31-33 (Dec. 1, 2006).  During the trial, Defendant's stand-by counsel moved to strike Alapa's testimony on recall for this same reason, arguing that it was inadmissible because Alapa had a conversation with Marumoto in the witness room after Alapa originally testified but before Alapa retook the stand.  See Transcript of Proceedings at 44-47 (June 23, 2006).  However, Defendant's stand-by counsel subsequently withdrew that motion to strike and informed the Court that Marumoto informed counsel that he was talking to Alapa about non-case related matters.  Id. at 77. Furthermore, Alapa stated in a declaration (and reiterated at the evidentiary hearing) that "At no time during the trial or otherwise, did I speak to witness Eric [Marumoto] about his testimony, the testimony of any other witness or anything else relevant to Defendant's case."  See Alapa Decl. at 1 (Sept. 1, 2006); see also Transcript of Proceedings at 56-57 (Dec. 1, 2006).  The Court finds that the evidence demonstrates that Alapa did not have any improper contact with Marumoto and did not intimidate or coerce Marumoto.

26

The Court finds that the evidence surrounding
Marumoto's testimony at trial does not indicate any impropriety
by the Government.   The prosecution's conduct did not interfere
with Marumoto's free and unhampered determination to testify
truthfully.   See Woodford, 384 F.3d at 602.[15]

**B.   Bibian Nguyen**

Defendant also argues that Bibian Nguyen was
intimidated by the Government.   See Reply 4.   At trial, Nguyen
twice testified that she changed the lock to her Ala Moana
Boulevard apartment approximately one month after Silva moved
out.   In her post-trial declaration, she contradicted that
statement, saying that she changed the lock only after Silva and
Defendant were arrested (which was more than six months after
Silva moved out).   Nguyen's declaration stated:

> I did not change the lock on my apartment until after
> Michael Silva and James Low were arrested, and only
> after my apartment had been broken into.   I was
> confused and misspoke at trial when I testified that I
> changed the lock to my apartment after Michael Silva
> moved out.   I was very nervous, and was very upset that
> Mr. Inciong had lied to me when he told me earlier in
> his office that I would not have to provide the names
> of my clients who supported me, but then forced me to
> give up their names while I was on the stand . . . .

See Nguyen Decl. at 3 (Sept. 22, 2006); see also Transcript of

---

[15]The Court need not reach the issue of whether
unconstitutional prosecutorial interference can occur even where
the witness takes the stand and answers all questions posed,
since here the Court finds that the Government committed no
misconduct.

Proceedings at 35-37 (Nov. 27, 2006).

Nguyen also stated in her declaration, and reiterated at the evidentiary hearing, that she "felt intimidated" when two federal agents served her with a trial subpoena because they banged on the front door and yelled "You better come outside." Id. at 1-2; see also Transcript of Proceedings at 27-28 (Nov. 27, 2006). She stated in her declaration that the agents intimidated her by telling her "If you lie to me about anything that I ask you, I can come back to arrest you;" that when she responded that the extra room in her apartment belonged to Silva, the agent insisted "no, it's not;" and that the agent went on to tell her "I'm going to charge you for being sarcastic." Id. at 2. Finally, Nguyen's declaration stated that she is "not a native English language speaker, and [she] felt intimidated by the agents." Id. at 2-3.[16]

_____

[16]Prior to trial, Defendant indicated that Nguyen would be able to testify in English. See Transcript of Proceedings at 26 (June 1, 2006). At trial, Nguyen testified without the assistance of an interpreter. At the request of Defendant's stand-by counsel at the evidentiary hearing, Nguyen was provided with an interpreter at the evidentiary hearing. It is clear to the Court, however, that the interpreter was not necessary. Nguyen frequently answered questions before they had been interpreted by the interpreter (sometimes even answering in English instead of Vietnamese); Nguyen indicated at various times that she had trouble answering in Vietnamese and would prefer to respond to the questions in English. See Transcript of Proceedings at 8-11, 18-19, 29 (Nov. 27, 2006). Even the interpreter interrupted to inform the Court that Nguyen was having difficulty understanding Vietnamese and that Nguyen's ability to express herself in English is better than in
                                                    (continued...)

The Court finds that the prosecution did not improperly intimidate Nguyen or interfere with her testimony in violation of <u>Vavages</u> and <u>Woodford</u>.  First, the Court finds that Nguyen's declaration and her post-trial testimony at the evidentiary hearing lack credibility.  She testified at trial that she is Defendant's girlfriend and lives with Defendant's parents.  At the evidentiary hearing, she indicated that she visits Defendant at the Federal Detention Center approximately twice a week, and has been doing so since the time of his arrest a year and a half ago.  <u>See</u> Transcript of Proceedings at 19-20 (Nov. 29, 2006).[17] Clearly, she has an interest in seeing Defendant acquitted.

At trial, she was hostile to the Government when she was on the stand, yet she testified on direct exam (in detriment to the defense) that she had changed the lock to her apartment approximately one month after Silva moved out of the apartment. Of note, she volunteered this information on direct exam; it was not in response to a direct question by the Government.

Nguyen's assertion now in her declaration and at the evidentiary hearing that she misspoke because (at least in part)

---

[16](...continued) Vietnamese.  <u>See</u> Transcript of Proceedings at 24-25 (Nov. 29, 2006).

[17]Nguyen testified at the evidentiary hearing that for the past year and a half (since Defendant's arrest), she has visited Defendant approximately twice a week, but that she has never spoken to Defendant about his case.  <u>See</u> Transcript of Proceedings at 18-21 (Nov. 29, 2006).

she had been forced to give up the names of her clients on the
stand is incredible - prior to her testimony revealing her
client's names, she testified that she changed the lock one month
after Silva moved out.  She repeated the testimony about the lock
on redirect examination (after having taken a twenty minute
recess since her testimony on direct examination about her
clients).

Moreover, the testimony at the evidentiary hearing by
case agent Gerald Lawson directly contradicted Nguyen and is more
credible than Nguyen's testimony.  Lawson testified that Nguyen
informed the Government in a pretrial interview, consistent with
her testimony at trial, that she had changed the lock one month
after Silva moved out.[18]  Lawson also testified about questioning
Nguyen when he served her with the subpoena, and his testimony
indicates that he did not threaten to arrest Nguyen, "charge
[Nguyen] with being sarcastic," or otherwise attempt to
intimidate or coerce her, as Nguyen alleges.  See Transcript of
Proceedings at 73-75 (Dec. 1, 2006).[19]

_____

[18]Also contrary to Nguyen's declaration and post-trial
testimony, Lawson testified at the evidentiary hearing that the
subject of prostitution and/or Nguyen's "clients" was not
discussed at the pretrial interview and the Government did not
make any promise to Nguyen that she would not have to "give up"
her clients' names on the stand.  See Transcript of Proceeding at
75 (Dec. 1, 2006).

[19]Nguyen's testimony at the evidentiary hearing also
contradicts the testimony of detective Joyce Alapa.  Nguyen
(continued...)

30

Nguyen's declaration and testimony at the evidentiary
hearing are made even less credible by her own flip-flopping at
the evidentiary hearing itself.  She testified on direct
examination at the evidentiary hearing that she told the
prosecutor in a pretrial interview that she had changed the lock
one month after Silva was arrested.  <u>See</u> Transcript of Proceeding
at 36-37 (Nov. 27, 2006).  Then, on cross examination at the
evidentiary hearing, she testified that she did not discuss the
lock with the prosecutor in the pretrial interview at all;
rather, she stated that the first time she ever talked about
changing the lock was at the trial.  <u>See</u> Transcript of Proceeding
at 27-28 (Nov. 29, 2006).  Certainly, Nguyen's inability to stick

---

[19]/(...continued)
testified at the evidentiary hearing that, on the day of
Defendant's arrest, agents forced their way into the Ala Moana
Boulevard apartment without Nguyen's consent; Nguyen also stated
that she did not tell Alapa that Defendant had control of the
guest bedroom in the apartment or that he sold ice.  <u>See</u>
Transcript of Proceedings at 15, 47-48 (Nov. 27, 2006).  Alapa
testified at the trial and again at the evidentiary hearing that
Nguyen invited Alapa into the apartment at Ala Moana Boulevard
(at which time Alapa accompanied Nguyen so that Nguyen could get
dressed, but Alapa refused to search the apartment until a search
warrant was obtained).  <u>See</u> Transcript of Proceedings at 17-19
(June 22, 2006); Transcript of Proceedings at 64-71 (Dec. 1,
2006).  Alapa also testified at the evidentiary hearing that
Nguyen told Alapa that Defendant controlled the guest bedroom in
the apartment and that Defendant supplied Nguyen with ice.  <u>See</u>
Transcript of Proceedings at 58-59 (Dec. 1, 2006).  Finally, the
Court notes that Alapa testified at the evidentiary hearing that
she did not attempt to threaten, coerce or intimidate Nguyen into
speaking to her.  <u>Id.</u> at 59.  For the reasons described in this
order and having observed the witnesses' demeanor, the Court
finds Alapa's testimony to be highly credible - much more
credible than Nguyen's post-trial allegations.

to one story makes her testimony unbelievable.[20]   In summary, the
Court finds Nguyen's testimony at trial to be more credible than
the contradictory statements in her current declaration or at the
evidentiary hearing.   The Court finds no evidence that Nguyen was
intimidated or coerced by the Government.

Second, even if Nguyen's declaration and post-trial
testimony were credible, the Court finds that her allegations do
not rise to the level of prosecutorial misconduct - and the
prosecution was not aware of any incorrect testimony, see <u>infra</u>
Section III.A.   The prosecution's conduct did not interfere with
Nguyen's free and unhampered determination to testify truthfully.
<u>See</u> <u>Woodford</u>, 384 F.3d at 602.

### C.   Melvin Quartero

In addition to Marumoto and Nguyen, Defendant argues
that defense witness Melvin Quartero was improperly intimidated
into testifying falsely at trial.   <u>See</u> Defendant's Supp. Memo at
15-16.   Defendant asserts that he interviewed Quartero prior to
Quartero's testimony and that Defendant understood that
Quartero's testimony would be different than the testimony given.

---

[20]/Moreover, Nguyen admitted that she waited a full two weeks
after the trial to approach Defendant's stand-by counsel to
inform him that she had supposedly testified incorrectly at
trial.   <u>See</u> Transcript of Proceedings at 39 (Nov. 27, 2006).   It
is incomprehensible to this Court that a key witness, Defendant's
girlfriend who visits him twice a week at the detention center,
would wait two weeks to inform defense counsel that she testified
incorrectly at trial, such that she weakened Defendant's case.

Id. Defendant offers no declaration or other evidence on the subject. In contrast, the Government submits evidence that Quartero was not even interviewed by the Government prior to trial. See Declaration of Gerald Lawson at 1 (Sept. 1, 2006). Once again, the Court finds that there is no evidence of Government misconduct.

In summary, the Court finds no basis to Defendant's allegation that the Government intimidated and interfered with his witnesses.[21] The declarations provided by Defendant and the testimony at the evidentiary hearing do not indicate to the Court that the interests of justice would be served by granting Defendant's motion.

## III. Alleged False Testimony

Defendant argues that a new trial is warranted because the Government allegedly permitted knowingly false testimony at trial. See Defendant's Supp. Memo at 10 n. 4; Reply at 4-5.

"The due process clause entitles defendants in criminal cases to fundamentally fair procedures. It is fundamentally unfair for a prosecutor to knowingly present perjury to the jury." United States v. LaPage, 231 F.3d 488, 491 (9th Cir. 2000). Accordingly, a conviction obtained through the use of false evidence, known to be false by the prosecutor, violates the

---

[21]/The Court denies the Government's motion to strike the allegations from the record. See Opposition at 4-5.

defendant's due process rights.  <u>Id.</u>; <u>see also</u> <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).[22/]  Defendant's right to due process is violated even if the prosecutor did not solicit the false evidence, but allowed it to go uncorrected when it appears.  <u>See</u> <u>Napue</u>, 360 U.S. at 270; <u>LaPage</u>, 231 F.3d at 491.  "[A] prosecutor must correct false evidence whenever it appears."  <u>Morris v.</u> <u>Ylst</u>, 447 F.3d 735, 743 (9th Cir. 2006); <u>see also</u> <u>LaPage</u>, 231 F.3d at 492 ("[T]he government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false.  Where the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts.").

Moreover, whenever a prosecutor suspects perjury, the prosecutor has a duty to investigate.  <u>See</u> <u>Morris</u>, 447 F.3d at 744.

In evaluating Defendant's claim that the prosecution knowingly presented false testimony at trial, Defendant's conviction must be reversed if two conditions are met: "first, the prosecution knowingly presented false evidence or testimony at trial; and second, it was material, that is, there is a

_____

[22/]Indeed, "[n]o lawyer, whether prosecutor or defense counsel, civil or criminal, may knowingly present lies to a jury and then sit idly by while opposing counsel struggles to contain this pollution of the trial."  <u>LaPage</u>, 231 F.3d at 492.

reasonable likelihood that the false evidence or testimony could
have affected the judgment of the jury." Morris, 447 F.3d at
743; see also United States v. Zuno-Arce, 339 F.3d 886, 879 (9th
Cir. 2003) (petitioner must show that "(1) the testimony (or
evidence) was actually false, (2) the prosecution knew or should
have known that the testimony was actually false, and (3) that
the false testimony was material.").

### A.    Nguyen's Testimony

Defendant argues that the Government permitted Nguyen
to testify falsely about when she changed the lock to her
apartment. See Defendant's Supp. Memo at 10 n. 4. Defendant
maintains that Nguyen informed the Government at a pretrial
interview that she changed the lock after Defendant was arrested
(that is, more than six months after Silva moved out); thus,
according to Defendant, the prosecutor permitted testimony that
he knew to be false when he did not clarify Nguyen's testimony
that she changed the lock one month after Silva moved out of her
apartment. Id.; see also Reply at 5. The Court finds that the
Government did not permit knowingly false testimony by Nguyen.

First, the Court finds based on the evidence before it
that Nguyen's testimony at trial (that the lock was changed one
month after Michael Silva moved out) was not false. As discussed
above in Section II.B., Nguyen's post-trial testimony and
declaration lack credibility. Contrary to her post-trial

testimony, the Court finds that the evidence as a whole demonstrates that the lock was changed one month after Silva moved out.

Second, even if Nguyen's testimony about the lock was false, the prosecutor did not know that the testimony was false. As case agent Lawson explained, Nguyen told the Government at a pretrial interview that she changed the lock one month after Silva moved out - in other words, Nguyen testified at trial consistently with what she had previously told the Government regarding the lock.[23/]   Additionally, the Government would have had no reason to suspect that Nguyen's statements at the pretrial interview regarding the lock were false, since Nguyen voluntarily provided that information to the Government at the pretrial interview, in detriment to her boyfriend's case.

Accordingly, the Court finds that the Government did not knowingly (or otherwise) permit Nguyen to testify falsely at trial.

## B.   Algaroba Street Apartment

To the extent Defendant argues that the Government knew, or should have known, that the Algaroba Street apartment

---

[23/]As discussed above, Nguyen's post-trial testimony on this point is completely incredible.  At the evidentiary hearing, she first testified that she told the Government at a pretrial interview that she changed the lock only after Silva was arrested; later, she testified that she never discussed the lock with the Government prior to trial.  See discussion supra at Section II.B.

36

was allegedly leased to Michael Silva, the Court finds that the Government did not knowingly permit false testimony at trial.

First, Defendant points to no specific portion of Marumoto's testimony at the trial that was allegedly false. Marumoto testified at trial that he planned to rent the apartment to Defendant, however, he also stated that he received copies of two identifications for purposes of renting out the apartment - he did not state to whom those identifications belonged. See Transcript of Proceedings at 23 (June 23, 2006) ("What I was going to do was rent it out to Mr. Low because, in the way it was -- in no condition to be rented out.") (emphasis added); id. at 24 ("Q: Did you reach an agreement with Mr. Low? A: Well, the work wasn't completed yet.  And what happened was, you know, until it was completed, we couldn't give a total amount . . . ."); id. at 24-25 ("one of [Defendant's] friends gave me a copy of two identifications" and "right after I received that copy of the identification, my car got stolen, so I have no recollection or who, or --").  Marumoto also stated that Defendant gave Marumoto a deposit and Marumoto gave Defendant the keys to the apartment.  Id. at 25.  Marumoto's testimony at the evidentiary hearing on these issues is consistent with his testimony at trial, but Marumoto clarified at the evidentiary hearing that, at some point, Defendant decided against renting the apartment because he had a dog, but indicated to Marumoto that Defendant

37

had a friend who would rent the apartment.  <u>See</u> Transcript of Proceedings at 22-24 (Dec. 1, 2006).  Marumoto maintained that Defendant gave him the cash deposit for the apartment and that he received two identifications for rental purposes; Marumoto clarified at the evidentiary hearing, however, that the identifications did not belong to Defendant, and also indicated that he now recalls receiving a signed rental agreement.  <u>Id.</u> Thus, based on the testimony at the evidentiary hearing, it does not appear that any false testimony was presented at trial by Marumoto (although Marumoto's trial testimony did not paint as complete a picture as his subsequent post-trial testimony).[24]

Second, the Government diligently tried to obtain a copy of any rental agreement for the Algaroba Street apartment, but was unable to discover any.  <u>See</u> Transcript of Proceedings at 110 (Dec. 1, 2006) (Lawson contacted the apartment building manager and the owner of the apartment and was informed that there was no paper lease); <u>see also</u> Transcript of Proceedings at 67-70 (June 21, 2006) (owner informed Lawson that no lease existed).  Even if Keliinoi told task force officer Thomas Cayetano that Marumoto had a copy of a lease showing that the

---

[24]/To the extent that Silva's trial testimony may have been false when he indicated that he did not lease the Algaroba Street apartment, Defendant's rights were not violated because (as described <u>infra</u>) the Government did not know (and should not have known) that the testimony was false and, in any event, the testimony was not material.

apartment was not rented to Defendant,[25/] it would not have

mattered if the Government interviewed Marumoto earlier because

Marumoto did not have a copy of the lease or the identifications

(and did not remember whose names were on them), so the

Government could not have obtained the documents from Marumoto.

_____

[25/]Keliinoi testified at the evidentiary hearing that she
told Cayetano that Marumoto had a copy of the rental agreement.
See Transcript of Proceedings at 40 (Dec. 1, 2006).  Cayetano
testified that he could not recall whether Keliinoi told him
about a rental agreement or that Silva was renting the apartment.
See Transcript of Proceedings at 20-21 (Dec. 4, 2006).  However,
Cayetano testified that even if Keliinoi had given him such
information, Cayetano would not have believed Keliinoi because
Cayetano had evidence from other sources that Defendant operated
out of the Algaroba Street apartment and because past information
provided by Keliinoi had not been entirely reliable regarding
other suspects on whom she snitched.  Id. at 23-29.  Keliinoi
denied snitching on the other suspects.  See id. at 41-43.  The
Court notes that, in general, it finds Keliinoi to be an
incredible witness in light of her demeanor, her motivation as a
friend of Defendant, the contradictions between her testimony and
other witness testimony, and the inconsistencies in her
testimony.  For example, after a firearm had been introduced at
trial in a black bag of similar shape to an ukelele bag, Keliinoi
testified that she witnessed Silva store a gun in the storage
locker "in a black bag, kind of like a [sic] ukelele bag."  See
Transcript of Proceeding at 53-54 (June 23, 2006).  This
testimony was completely controverted by testimony of Special
Agent Charles Pang, who testified that he placed the firearm into
the small black ukelele-type bag for purposes of trial, but that
no firearms were in such a bag at the storage locker.  See
Transcript of Proceedings at 5-11 (June 27, 2006).  The ukelele-
type bag belonged to the Government.  Id.  Pang testified that
the firearms were taken into custody in a large green canvas
duffel bag that bore no resemblance whatsoever to the small black
ukelele-type bag.  Id. at 6, 8.  The large green duffel bag was
introduced into evidence.  See id. at 11-12.  In the Court's
opinion, Pang's testimony and the introduction of the green
duffel bag completely undermine Keliinoi's credibility; it
appears that Keliinoi was fabricating testimony to assist
Defendant.

<u>See</u> Transcript of Proceedings at 23 (Dec. 1, 2006).[26/]

─────────────────

[26/]At the evidentiary hearing, the defense argued that
certain evidence provided to the Government by Keliinoi was not
disclosed to Defendant prior to trial, presumably in violation of
<u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The Government has an
obligation under <u>Brady</u> to provide exculpatory evidence to a
criminal defendant.  <u>See</u> <u>United States v. Blanco</u>, 392 F.3d 382,
387 (9th Cir. 2004).  "To establish a <u>Brady</u> violation, the
evidence must be (1) favorable to the accused because it is
either exculpatory or impeachment material; (2) suppressed by the
government, either willfully or inadvertently; and (3) material
or prejudicial."  <u>Id.</u>  The Court finds no <u>Brady</u> violation here.
Keliinoi testified at the evidentiary hearing that she informed
Cayetano in October 2005 that a rental agreement existed for the
Algaroba Street apartment, and that the rental agreement
indicated that the apartment was being rented by someone other
than Defendant.  <u>See</u> Transcript of Proceedings at 38-40 (Dec. 1,
2006).  Keliinoi testified that she also told Cayetano prior to
trial that the firearms found in the storage locker did not
belong to Defendant.  <u>Id.</u> at 43.  At the evidentiary hearing,
Cayetano could not recall whether Keliinoi told him anything
about a rental agreement; Cayetano confirmed that Keliinoi told
him that the firearms did not belong to Defendant.  <u>See</u>
Transcript of Proceedings at 20, 25-26 (Dec. 4, 2006).  Even
assuming Keliinoi provided this information to the Government (by
telling Cayetano), the information was not suppressed by the
Government because Defendant himself knew the information.  <u>See</u>
<u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (<u>Brady</u> is
implicated by information that is known to the prosecution but
"unknown to the defense") (abrogated, in part, on other grounds
by <u>United States v. Bagley</u>, 473 U.S. 667 (1985)); <u>United States
v. Dupuy</u>, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985) ("Where
defendants . . . had within their knowledge the information by
which they could have ascertained the supposed <u>Brady</u> material,
there is no suppression by the government.") (quoting <u>United
States v. Griggs</u>, 713 F.2d 672, 674 (11th Cir. 1983)); <u>see also
United States v. Wood</u>, 57 F.3d 733, 737 (9th Cir. 1995) (under
<u>Brady</u>, the agency charged with the administration of the statute,
which has consulted with the prosecutor, is considered part of
the prosecution).  Keliinoi testified at trial that she told
Defendant, prior to trial, the same information that she told
Cayetano.  <u>See</u> Transcript of Proceedings at 59 (June 23, 2006).
Keliinoi testified at the evidentiary hearing that she provided
stand-by counsel with the information soon after she learned
about the firearms charge, prior to trial.  <u>See</u> Transcript of
                                                   (continued...)

Moreover, even if Keliinoi told Cayetano that Melissa Spinola's

(Silva's girlfriend's) name was on the lease, Cayetano testified

that he and Spinola did try to get in touch with each other

pertaining to Defendant's case, but were unable to reach each

other.  <u>See</u> Transcript of Proceedings at 22-23 (Dec. 4, 2006).

Indeed, even Defendant's witnesses were not able to obtain a copy

of the lease until weeks or months after the trial.  <u>See</u>

<u>generally</u> Reply (lease attached as exhibit).  Thus, the

Government investigated whether a rental agreement was available

for the Algaroba Street apartment, but was unable to obtain a

copy despite their efforts.  The Government could not have been

expected to know that Silva and Spinola signed a rental agreement

for the Algaroba Street apartment.

---

[26]/(...continued)
Proceeding at 44 (Dec. 1, 2006).  Indeed, Keliinoi was named on
Defendant's witness list and testified at trial in detail about
this same information that she allegedly provided to Cayetano.
Additionally, Keliinoi testified at the evidentiary hearing that
Defendant knew that the Algaroba Street apartment was leased to
Silva and knew that a rental agreement had been provided to
Marumoto, because Defendant was present when the agreement was
provided to Marumoto.  <u>See</u> Transcript of Proceedings at 34-35
(Dec. 1, 2006).  Accordingly, the Court finds that <u>Brady</u> is not
implicated because Defendant knew of the evidence that was
allegedly suppressed.  Moreover, even if Defendant had not know
about the evidence, Defendant was not prejudiced because the
evidence was actually introduced by Defendant at trial, through
the testimony of defense witness Keliinoi.  <u>See</u> <u>United States v.</u>
<u>Bagley</u>, 473 U.S. 667, 682 (1985) ("The evidence is material only
if there is a reasonable probability that, had the evidence been
disclosed to the defense, the result of the proceeding would have
been different.").  In summary, the Court finds that no <u>Brady</u>
violation occurred.

Third, a copy of the rental agreement signed by Silva and/or other evidence that the apartment was allegedly leased to Michael Silva are not material pieces of evidence.  See Morris, 447 F.3d at 743 (for Defendant's conviction to be overturned, the false testimony must be material, that is, there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury).  Keliinoi testified to these facts at trial, so there was evidence introduced that Silva was renting the Algaroba Street apartment.  See Transcript of Proceedings at 42, 49 (June 23, 2006).  Even if the jury believed that Silva (the alleged co-conspirator) was renting the Algaroba Street apartment, Defendant was charged in Count 1 of conspiring with Silva to distribute the drugs.

More importantly, the uncontroverted evidence introduced at trial was that Defendant had unfettered access to the Algaroba Street apartment.  Marumoto testified that he gave Defendant the keys to the apartment; Special Agent Lawson testified that Defendant had keys to the apartment on him when he was arrested.  See Transcript of Proceedings at 25 (June 23, 2006); Transcript of Proceedings at 55 (June 21, 2006).[27]

---

[27]Marumoto reiterated this testimony at the evidentiary hearing.  See Transcript of Proceedings at 23 (Dec. 1, 2006).  At the evidentiary hearing, Keliinoi testified that Marumoto gave Defendant two sets of keys.  Id. at 35.  Keliinoi later testified that Defendant had one set of keys, Keliinoi had one set, and Silva had one set.  Id. at 35, 53-54.

Marumoto also testified that Defendant was "fixing up" the apartment in exchange for a discount on the rent.  Id. at 22-23.[28/]  According to uncontroverted testimony at trial, agents saw Defendant on the balcony of that apartment immediately before he was arrested (while Silva was in law enforcement custody), a wallet containing Defendant's driver's license and other personal items (admitted into evidence) were found at that apartment, and the drugs and drug paraphernalia were in plain view in the apartment.  See, e.g., Transcript of Proceedings at 19-20, 127-137, 150-151, 181-200 (June 21, 2006).  At the time of Defendant's arrest, Defendant had come down from the apartment to the entrance of the apartment building to let Silva into the building – as Silva apparently did not have keys to access the apartment building, but Defendant did have keys.  See Transcript of Proceedings at 55, 96-97 (June 21, 2006); see also Trial Exhibit 2 (transcript of telephone calls).  Thus, the evidence clearly demonstrated that Defendant had access to the Algaroba Street apartment and was in the apartment (with access to the drugs) immediately prior to his arrest.[29/]

---

[28/]Indeed, Defendant's theory of the case is that he had access to the Algaroba Street apartment because he was painting and repairing that apartment.  At the evidentiary hearing, Keliinoi testified that Defendant had keys to the apartment and was in the process of painting and repairing the apartment.  See Transcript of Proceedings at 35-36, 53-54 (Dec. 1, 2006).

[29/]Furthermore, irrespective of who may have signed a lease
(continued...)

Accordingly, the Court finds that the Government did not knowingly permit false testimony at trial regarding the Algaroba Street apartment, and even if it had, that testimony was not material.

## IV.  Response to Jury Question

On June 28, 2006, during deliberations, the jury returned a note stating: "We would like to request any pictures or video from the storage unit on old Waialae Rd.  Also would like to request any receipt/proof that the locks were changed at 1910 Ala Moana."  The Court responded in writing as follows:

> You were instructed in Jury Instruction No. 6 that "In reaching your verdict you may consider only the testimony and exhibits received into evidence."  The items requested by you were not received into evidence. The Court reiterates that in reaching your verdict you may consider only the testimony and exhibits received into evidence.

> Defendant argues that the Court should have included in

---

[29]/(...continued)
for the apartment, there was no furniture in the apartment, it did not appear to be lived in, and it had tools scattered about. See Transcript of Proceedings at 80-81 (Dec. 1, 2006).  Even Silva's girlfriend indicated in a declaration after the trial, which was proffered by Defendant, that "I never moved into the apartment as it was being repaired; we had to stay in hotels" and that Silva "referred to the apartment as the 'empty apartment.'" See Declaration of Melissa Spinola at 2-3 (Sept. 22, 2006). Thus, it appears to the Court that no one was living in the Algaroba Street apartment; however, even if Silva (Defendant's alleged co-conspirator) was living there, that fact does not change the fact that Defendant had unfettered access to the apartment and was there immediately prior to his arrest (immediately prior to when the drugs were confiscated from the apartment).

its response to the jury a statement that "a reasonable doubt may arise from lack of evidence." <u>See</u> Defendant's Supp. Memo at 17. Defendant argues that a new trial is warranted because "the jury was denied an instruction going to a major theory of the defendant's case at a critical juncture of the jury's deliberation." <u>Id.</u>

The Court finds no error in declining to include such a statement in response to the jury's question.  The jury did in fact receive instruction that reasonable doubt may arise from a lack of evidence.  <u>See</u> Jury Instruction No. 4.[30/]  There was no need to reiterate that instruction regarding lack of evidence in this circumstance, where the jury did not specifically inquire about that instruction or topic, and there <u>was</u> some evidence admitted on the subject - evidence regarding the firearms at the storage unit and regarding the lock being changed at the apartment on Ala Moana Boulevard were admitted in the form of testimony and in the form of the firearms themselves - despite there being no photos or videos admitted.  For these reasons, the Court finds that it did not err in declining to include a statement about reasonable doubt in its response to the jury question.

---

[30/]Paragraph 2 of Jury Instruction No. 4 stated: "A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence."

Finally, the Court finds that even if it had erred in declining to include the statement, Defendant did not suffer any harm.  As to the firearm count, Defendant could not have suffered any harm because he was found not guilty on that count.  As to the drug counts, Defendant did not suffer any harm for two reasons.  First, irrespective of whether the lock on the front door had been changed, there was overwhelming evidence linking Defendant to the drugs in the Ala Moana apartment.  For example, a prescription pill bottle with Defendant's name on it was found in the safe in the guest bedroom, in the same bag that contained crystal methamphetamine.  See Transcript of Proceedings at 29-30 (June 23, 2006).  Second, even if the jury had found that the drugs at the Ala Moana apartment did not belong to Defendant, there was overwhelming evidence that the more than 50 grams of methamphetamine at the Algaroba Street apartment (which were not implicated in the jury's question) were in Defendant's possession.[31]  For example, agents testified that the drugs and drug paraphernalia were in plain view in the Algaroba Street apartment, that they saw Defendant on the balcony of that apartment immediately before he was arrested, and that a wallet containing Defendant's driver's license and other personal items

---

[31]Defendant faced a statutory mandatory life sentence for possessing with intent to distribute the more than 50 grams of methamphetamine at the Algaroba Street apartment alone, because of his two or more prior felony drug convictions.  See 21 U.S.C. § 841(b)(1)(A).

46

(admitted into evidence) was found at that apartment.  <u>See, e.g.,</u> Transcript of Proceedings at 19-20, 127-137, 150-151 (June 21, 2006).

In summary, the Court finds no merit to Defendant's argument that the Court's response to the jury question was deficient.

## V.   Newly Discovered Evidence

In his Second Reply Brief, Defendant argues that a new trial is warranted because a copy of the rental agreement for the Algaroba Street apartment, which shows that the apartment was rented by Silva and Spinola, was discovered after the trial.  <u>See</u> Second Reply Brief at 2.  Even assuming the rental agreement is "newly discovered evidence," the Court has already found that it is an immaterial piece of evidence.  As discussed, <u>supra</u> Section III.B., even if the jury believed that Silva (the alleged co-conspirator) was renting the Algaroba Street apartment, the uncontroverted evidence (at trial and at the evidentiary hearing) indicates that Defendant had unfettered access to the Algaroba Street apartment, and thus access to the drugs and drug paraphernalia that were in plain view in the apartment, which defendant had exited immediately before his arrest.  For the reasons discussed <u>supra</u>, the Court finds that no miscarriage of justice occurred when the rental agreement was not introduced into evidence.

To the extent that Defendant also argues in his Second Reply Brief that Cayetano's testimony at the evidentiary hearing indicates that exculpatory evidence was not provided to Defendant by the Government, the Court has already found that no <u>Brady</u> violation occurred.  <u>See</u> <u>supra</u> note 26.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the Court denies Defendant's Motion for New Trial.  The Court finds that the interest of justice is served by denying the motion because none of Defendant's rights were violated and the Court committed no error.  Additionally, the Court notes that the overwhelming weight of the evidence supports the guilty verdicts on Counts 1 and 2.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 15, 2006.



_____
Alan C. Kay
Sr. United States District Judge